0117

STATE of South Carolina, ex relatione Daniel R. McLEOD, Attorney General, Appellant, v. T. A. COATES, Jr., Fred Bryant, and Dixon Walters, Respondents.

(313 S. E. (2d) 642)

Court of Appeals

*Atty. Gen. T. Travis Medlock, Retired Atty. Gen. Daniel R. McLeod,* and *Asst. Atty. Gen., William K. Moore,* Columbia, *for appellant.*

*Jack T. Flom,* Myrtle Beach, *for respondents.*

March 5, 1984.

BELL, Judge:

This action was brought by the State, on the relation of its Attorney General, seeking to enjoin the respondents from operating a bingo game. The respondents counterclaimed, inter alia, for a declaratory judgment that the bingo game was lawful. The circuit court entered declaratory judgment for the respondents. The Attorney General appeals. We affirm.

The respondents Coates, Bryant, and Walters are partners engaged in the business of operating bingo games. They have operated games at various locations in South Carolina. Coates, a retired law enforcement officer, also leases equipment for bingo games in North Carolina.

The respondents conduct their business in two ways. They operate games under their own bingo certificate pursuant to the "county fair" exception to the lottery laws. *See,* § 52-17-20, Code of Laws of South Carolina, 1976, as amended. They also contract to operate games as a fund raising activity for char-

itable organizations licensed to conduct bingo games pursuant to § 52-17-10 et seq., Code of Laws of South Carolina, 1976, as amended. They have, for example, operated large scale bingo games on behalf of the Jamil Temple in Columbia under its bingo certificate. This appeal involves only the latter method of operation.

In late March, 1981, the respondents entered into a contract with the James F. Byrnes Academy (Byrnes) to "jointly operate a bingo game in Florence, South Carolina," under the terms and conditions specified in the contract. Byrnes is a private school organized for charitable, religious or fraternal purposes within the meaning of § 52-17-20, Code of Laws of South Carolina, 1976, as amended. Prior to entering the contract, Byrnes had applied for and obtained a bingo certificate from the Secretary of State. The circuit court found that Byrnes's application complied in all respects with the requirements of § 52-17-20(1), Code of Laws of South Carolina, 1976, as amended.

The contract provided for a bingo game to be held on April 11, 1981. It obligated the respondents to furnish all equipment and personnel and to assume "full responsibility" for running the bingo game. Respondents were also to assume responsibility for all financial obligations and liabilities concerning the operation and promotion of the game. Byrnes was guaranteed a minimum of $1000 regardless of the number of players at the bingo game. If 2800 or more players entered the premises, Byrnes was to receive $10,000 from the game.

The respondents actively promoted the game throughout the Southeast, advertising it as the "Largest Ever Held East Of The Mississippi River." At Byrnes's direction, its name was not mentioned in any advertising. Presumably as a result of this advertising campaign, the game came to the attention of the Attorney General.

The Attorney General commenced this action on April 2, 1981, by a petition for injunctive relief and rule to show cause. The petition sought an injunction prohibiting the respondents from conducting any bingo games in Florence County unless and until they obtained a bingo certificate from the Secretary of State. The Attorney General alleged that under the contract between Byrnes and the respondents, the profits from the game were not to be used for the charitable, religious or

fraternal purposes of Byrnes, but would inure to the benefit of the respondents. He further alleged that the game would violate the lottery laws, since it would be "conducted" by the respondents, who did not have a bingo certificate. Byrnes was not made a party to the suit.

The respondents denied the material allegations of the petition and counterclaimed for a declaratory judgment that the game would be conducted by Byrnes and was not an illegal lottery.

After hearing testimony from several witnesses as to how the game would be operated, the circuit court found the respondents had been employed to assist with the operation of the game, but they were subject to the supervision, authority, and ultimate control of Byrnes. The court also found there was no assurance the respondents would make any money above their expenses under the contract, but held the law does not prohibit them from providing their equipment and services to a charitable organization at a profit to themselves. Finding no violation of the law in the respondents' contractual arrangement with Byrnes, the court denied the petition for injunctive relief and granted the counterclaim for declaratory relief. The game was held as scheduled on April 11, 1981.

## I.

■ Section 52-17-20 provides in pertinent part:

> The game of bingo, when conducted by charitable, religious or fraternal organizations exempt from federal income taxation ... shall not be deemed a lottery when:
>
> > (1) The charitable, religious or fraternal organization which conducts the game:
> >
> > > (a) maintains a valid bingo certificate issued by the Secretary of State....

The Attorney General concedes this section does not, as a matter of law, prohibit Byrnes from hiring respondents to run the bingo game. Indeed, another section of the statute implicitly recognizes that bingo licensees will employ others in the operation of bingo games, since it forbids a licensee to "employ or cause to be employed in the operation or conduct of the games of bingo" any person convicted of certain crimes.

*See,* § 52-17-25(A)(2), Code of Laws of South Carolina, 1976, as amended. The crux of the Attorney General's argument lies in his contention that the respondents "were, for all practical purposes, in complete control of the bingo games." He asks this Court to review the record and make findings of fact in accordance with its view of the preponderance of the evidence on the issue of who controlled the game in question.

We have carefully reviewed the entire record and perceive no basis to set aside the trial judge's finding that Byrnes would exercise ultimate control over the conduct of the game. Specifically, we find that Byrnes actually exercised or reserved the right to exercise control over the game in the following particulars: (1) Byrnes controlled the content of advertisements; (2) Byrnes controlled the price of all bingo cards; (3) Byrnes controlled the amount of prize money to be awarded; (4) Byrnes reserved the right to supervise the premises; (5) Byrnes reserved the right to supervise the manner in which the game was conducted; and (6) Byrnes reserved the right to stop the game at any time and remove its bingo certificate from the premises. In addition, Byrnes personnel were to be on the premises at all times while the game was being conducted and Byrnes was responsible for determining the number of paid admissions to the premises. These factors negate the Attorney General's assertion that the respondents were in "complete control" of the game.

## II.

The Attorney General also argues that the profits from the game would inure to the respondents, not Byrnes, under the terms of the contract. This, he claims, made the game an illegal lottery.

The circuit court held that a bingo licensee may, without violating the lottery laws, pay market value to a person hired to furnish equipment and services in connection with a licensed bingo game; that is, the equipment and services need not be provided at cost. The Attorney General concedes this point. However, he argues that this particular game violated the law because the respondents "stood to make more money from the bingo games than did James F. Byrnes Academy." We find two difficulties with this argument, one factual and one legal.

First, the Attorney General failed to prove that the respondents would, in fact, make more money on the game than Byrnes. Under the contract, Byrnes had no financial obligations and was guaranteed a minimum of $1000. On the other hand, the respondents were obligated to pay all expenses for the game regardless of the number of persons who played. The Attorney General did not establish the respondents' "break even" point under the contract. Conceiveably, the respondents might make no money above expenses if the turnout were poor. Notwithstanding this risk to the respondents, we agree it is reasonable to assume they would make some money above costs. The record is too scant to ascertain what that amount might be or whether it would exceed the profit to Byrnes under the contract. As the petitioner in this action, the Attorney General had the burden of proving the factual elements of his case. *Jackson v. Frier*, 146 S. C. 322, 144 S. E. 66 (1928); *Nolf v. Patton*, 114 S. C. 323, 103 S. E. 528 (1920). He failed to carry his burden of proof on the factual premise of his argument.

Second, the Attorney General's legal theory is flawed. He concedes the law does not prohibit a licensee from paying others to assist it in conducting a game. *But cf.*, *State v. Johnston*, 56 Or. App. 849, 643 P. (2d) 666 (1982) (Oregon Bingo Act prohibits anyone other than player or charitable organization to profit from game; individual members of organization cannot be paid for assisting with games); *Brown v. Marine Club, Inc.*, 51 Ohio Misc. 51, 365 N. E. (2d) 1277 (1976) (Ohio Bingo Act forbids payment of compensation to anyone except security personnel). Nevertheless, he argues, the statute does require an officer of the licensee to make a sworn statement that the profits derived from the game shall be used for the charitable, religious or fraternal purposes of the licensee. § 52-17-20(1)(a)(ii), Code of Laws of South Carolina, 1976, as amended. In his view, this requirement translates into a rule that the money paid to the operator cannot exceed the profits to the charitable organization.

If the statute permits charitable licensees to pay operators to run the game, the Attorney General's argument must fail. There is no requirement in the statute that the licensee must make a profit on the game. Nor does it state that the profit, if any, must exceed the amount of money paid to those hired to

assist in operating the game. Suppose Byrnes had agreed to pay respondents a flat fee of $1000 for their services and had itself assumed the obligation to pay all expenses of the game. Under the Attorney General's proposed rule, Byrnes would be in violation of the law if turnout at the game was too low to generate a profit for Byrnes exceeding $1000. Similarly, if a licensee lost money on a game because of poor turnout, it could not legally honor its contractual obligations to persons employed to assist with the game, because those persons would then be making more money than the licensee had realized in profits.

We emphasize that we are not asked in this case to decide whether a charitable, religious or fraternal organization holding a bingo license may pay a bingo operator to operate games for it. The Attorney General and the respondents are not in dispute on that issue. Likewise, we do not decide what portion of the proceeds may be paid by a charitable licensee to others as "expenses" incident to conducting a bingo game. Given the state of the record and the positions of the parties in this case, those questions are not properly presented for our decision.

The exceptions are overruled and the judgment of the circuit court is

Affirmed.

SANDERS, C. J., and GARDNER, J., concur.